In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property and Rehabilitate the GLOBE AND RUTGERS FIRE INSURANCE COMPANY.*

Supreme Court, New York County, August 9, 1933.

* See, also, 148 Misc. 497, 501.

*Root, Clark & Buckner* [*Elihu Root, Jr., Wilkie Bushby* and *Donald Cruse* of counsel], and *Robert Kelly Prentice*, for Globe and Rutgers Fire Insurance Company.

*Barker, Perrigo & Bonynge* [*Wendell P. Barker* of counsel], for the Mutual Fire, Marine and Inland Insurance Company, as a creditor.

*Martin Conboy* [*Martin Conboy* and *David Asch* of counsel], for the committee representing certain creditors of Globe and Rutgers Fire Insurance Company.

*Milbank, Tweed, Hope & Webb* [*William Dean Embree* and *Eugene H. Southall* of counsel], for the Chase National Bank and others.

*Coudert Brothers* [*Frederick R. Coudert, Jr.*, and *George S. Montgomery, Jr.*, of counsel], for certain stockholders.

*Davis, Polk, Wardwell, Gardiner & Reed*, for the Rossia Insurance Company and the Metropolitan Fire Reassurance Company.

*Harold S. Deming*, for Marsh & McLennon.

*Basil O'Connor* [*John C. Farber, Saul J. Lance, William F. Snyder* and *Maurice Mound* of counsel], for the Superintendent of Insurance in charge of Globe and Rutgers Fire Insurance Company in rehabilitation.

FRANKENTHALER, J. This is an application by the Globe and Rutgers Fire Insurance Company for an order, pursuant to subdivision 3 of section 402 of the Insurance Law, terminating a proceeding for its rehabilitation and permitting it to resume possession of its property and the conduct of its business.

On March twenty-fourth of this year an order was entered in this court, upon the consent of the board of directors of the Globe

and Rutgers Fire Insurance Company, directing the Superintendent of Insurance to rehabilitate the company, which was concededly insolvent at the time. In accordance with the terms of the order, the Superintendent assumed possession of the property of the company and took over the conduct of its affairs for the purpose of attempting to remove the causes and conditions which had made the rehabilitation proceeding necessary. Shortly thereafter, having come to the conclusion that further efforts to rehabilitate would be futile, the Superintendent applied for an order directing him to liquidate the company. While the motion for an order of liquidation was pending, rising prices of securities upon the exchanges augmented the market value of the company's portfolio to a very large extent. Measures which were being taken by our national government with the avowed purpose of increasing prices had undoubtedly contributed to the advance which had already occurred, and they appeared to augur even higher prices in the future. At the same time, efforts were in progress which had as their goal the reorganization of the company through the conversion of a large part of its liabilities into preferred stock. It was claimed on behalf of the company that the proposed plan of reorganization would be accepted by sufficient creditors to make its adoption feasible. Recognizing that a substantial reduction in the company's liabilities at a time when advancing prices were enhancing the value of its assets would transform insolvency into a very considerable net worth, the court granted further time for the working out of a suitable plan of reorganization, and directed that liquidation be withheld in the interim.

The attempt to reorganize the company, however, soon proved abortive. The original plan of reorganization was objected to by certain of the larger creditors. An amended plan, drafted to meet their objections, turned out to be unacceptable to a majority of the *stockholders*. In this impasse, with no progress being made in the direction of reorganization, the Superintendent of Insurance suggested, for the protection of creditors and policyholders, that the speculative and inferior securities in the company's portfolio be sold and the proceeds employed to pay claims against the company as they became payable. The present motion to terminate the rehabilitation proceeding and to permit the company to resume the conduct of the business is the company's answer to the Superintendent's suggestions.

Subdivision 3 of section 402 of the Insurance Law, pursuant to which the present application has been made, provides that no order terminating rehabilitation and permitting an insurer to resume possession of its property and the conduct of its business

shall be granted "except when, after a full hearing, the court shall determine that the purposes of the proceeding have been fully accomplished." It is the claim of the company that the causes and conditions which have made the rehabilitation proceeding necessary have been removed and that the purposes of the proceeding have been fully accomplished. This contention is predicated upon the assumption that the rehabilitation proceeding was made necessary *solely* because of the temporary insolvency in which the company found itself in March, 1933, by reason of the depreciation in the value of its security holdings and a " run " to cancel policies and obtain unearned premiums which had commenced as a result of rumors concerning the company's financial condition. The moving papers upon the present application, served on July 7, 1933, contain affidavits of accountants employed by the company, stating that the market value of its securities rose from $19,972,409.32 on March 24, 1933, to $31,138,150.03 on July 3, 1933, an increase of $11,165,740.71, exclusive of securities sold in the interim pursuant to court orders. On March 24, 1933, liabilities admittedly exceeded assets to a very considerable extent, whereas on July 3, 1933, according to the company's affidavits, assets were greater than liabilities by more than $7,000,000. The company's accountants estimate that the cash required in order to reopen and resume business is slightly more than $4,000,000. The company claims that the cash now on hand, together with the proceeds of securities about to be sold in compliance with outstanding orders of the court, is almost sufficient to meet these cash requirements, and that further securities will be sold to the extent necessary to make up the balance. As to claims against the company which need not be paid immediately upon reopening, the company declares that as such claims are adjusted and become payable, further sales of securities will be made in such amounts as may be necessary to satisfy said claims. Accordingly, the company maintains that it is now solvent and able to pay its creditors as their claims mature for payment.

That the company was solvent on July 3, 1933, on the basis of the market value of its securities on that day, is admitted by the Superintendent of Insurance, although it is his claim that the net worth was only $6,103,703.23. Since that time, however, fluctuations in the market prices of the company's securities have been such that by July twenty-second the net worth of the company was reduced to $3,785,216 and its surplus to $1,785,216. Included in the assets is an award by the Mixed Claims Commission which is valued by Kingston, the company's accountant, at $2,600,000 and by Wolfe, the accountant employed by the Insurance Depart-

ment, at $2,000,000. The total amount now in the hands of the Mixed Claims Commission for distribution is $500,000. The balance will have to be recovered from Germany. If the award were reduced to its liquid value, $500,000, the company's surplus would be practically wiped out. It must be evident from the foregoing that the company's financial condition is far from good. The company is almost on the border line between solvency and insolvency and its surplus, if not already impaired, is dangerously close to impairment. No figures have been submitted by either the company or the Superintendent to show what changes in the market value of the securities have occurred since July twenty-second, but the court may take judicial notice of the fact that security prices now prevailing show very little increase, if any, over those obtaining on July twenty-second. At any rate, the company, having failed to submit any evidence as to prices since July twenty-second, the market quotations on that day must control in the determination of the present motion. In these circumstances, it is extremely questionable, to say the least, whether a proper case has been made out for terminating the rehabilitation proceeding and restoring the company to control of its property and business. This is so, since under subdivision (a) of section 401 of the Insurance Law, insolvency constitutes a ground for obtaining an order of rehabilitation, while under subdivision (c) of the same section, failure to make good impairment of capital also warrants the entry of such an order. An application to terminate rehabilitation and restore an insurer to control should not be granted where, as here, past experience has demonstrated that its solvency with an unimpaired capital may be merely ephemeral. The court cannot be expected to sit at a stock ticker for the purpose of checking the daily fluctuations in the values of the company's securities, terminating rehabilitation whenever the quotations wipe out capital impairment, however slightly, and restoring the Superintendent to control whenever they have the opposite effect. To entitle an insurer to be released from rehabilitation and to be permitted to resume the conduct of its business the margin between insolvency or impairment of capital on the one hand and solvency with an unimpaired capital on the other hand should be reasonably substantial. There must be a factor of safety.

However, even if the solvency of the company with an unimpaired capital were satisfactorily established it would not necessarily follow that it would be proper or necessary to grant the application for the termination of rehabilitation. Subdivision (e) of section 401 of the Insurance Law provides for an order of rehabilitation if an insurance company " is found, after an examination, to be in such

condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or to the public." It is the contention of the Superintendent of Insurance that by reason of the volatile character of most of its securities and the financial and business policies of its management, the further transaction of business by the company at this time would be hazardous to its policyholders and creditors as well as to the public. If this be so, manifestly, no order terminating the rehabilitation and restoring the company to control would be appropriate. On no conceivable theory is it possible to justify terminating rehabilitation while grounds for rehabilitation exist. Subdivision 3 of section 402 of the Insurance Law provides that no order terminating rehabilitation shall be granted " except when * * * the court shall determine that the purposes of the proceeding have been fully accomplished." This does not mean, as counsel for the company appear to argue, that an order of termination must be made if the specific causes which led to the order of rehabilitation have been removed. The statute declares that no order of termination shall be granted unless the purposes of the proceeding have been accomplished. It does not purport to prevent the court from requiring proof of additional facts, e. g., that no other grounds for rehabilitation exist. Even if the specific conditions which brought about the order of rehabilitation are removed, the order for the termination of rehabilitation may nevertheless be denied if other grounds for rehabilitation exist by the time of the motion to terminate rehabilitation. It is, therefore, unnecessary to determine whether the nature of the company's security holdings and the policies and character of its management were among the specific causes which led to the order of rehabilitation. The question here to be decided is solely whether these factors would justify an order of rehabilitation at this time had no such order been previously made.

Approximately eighty-five per cent of the assets of the Globe and Rutgers Company consists of security holdings. Upon the basis of market valuations on July 15, 1933, about twenty-three and four-tenths per cent of these securities consisted of bonds, and about seventy-six and six-tenths per cent of stocks. The affidavit of Collins, one of the State insurance examiners, states, without contradiction, that approximately fifty per cent of the bonds fall into " rating classifications below the first four investment grades and many issues held " are " distinctly inferior." This is confirmed by the court's independent examination of the securities comprising the company's portfolio. Many of the stocks held by the company are of a highly speculative character, the company's investment policy in the past having been influenced very largely by speculative

considerations. As a result of the volatile character of the security holdings of the company, the market value of its assets has fluctuated violently, as much as $1,500,000 in a single day. On December 31, 1929, the company's assets were over $106,000,000, and its surplus approximately $44,000,000. On December 31, 1932, the company still reported a substantial surplus. Yet less than three months later it was concededly insolvent. Between December 31, 1929, and March 24, 1933, a period of slightly more than three years, the value of its assets had shrunk to about $25,000,000, a decline of more than $80,000,000, while in the six months immediately preceding March 24, 1933, the security portfolio showed a loss of over $10,000,000 in market value. In the following three months the company's securities advanced over $11,000,000. From July 3, 1933, to July 15, 1933, market values increased an additional $1,672,040, only to drop $3,963,766 in the following week.

It must be obvious that a portfolio which is subject to such violent fluctuations in market value fails to offer the creditors and policyholders any reasonable assurance that their claims will be paid as they are adjusted and become payable. As previously pointed out, the company, even if now solvent, is perilously close to insolvency. One or two days of falling security prices, no worse than many which have been experienced in the recent past, would be sufficient to produce insolvency about which there could be no question. A company whose assets are of such a character that it swings back and forth between solvency and insolvency from month to month, or week to week, or even from day to day, is hardly entitled to have proceedings for its rehabilitation terminated and to be permitted to resume its business at a time when the margin between solvency and insolvency is a very narrow one. Clearly, the Superintendent of Insurance is correct in his conclusion that to allow the company to once more take over the conduct of its business in its present financial condition and with its highly volatile speculative portfolio, would, in the language of subdivision e of section 401 of the Insurance Law, be " hazardous to its policyholders, * * * its creditors " and " to the public." The Superintendent declares that he " is in favor of preserving and continuing, wherever feasible and possible, the business of any company under the jurisdiction of your deponent's department " and that he " is in favor of the rehabilitation of Globe and Rutgers Fire Insurance Company and the reopening of said company to transact the business for which it was incorporated, *provided said Company, when reopened, is a sound insurance institution, adequately financed and properly managed for the protection and safety of the public for which it transacts business.*" (Italics the court's.) He takes the

position, however, that before the company can be safely permitted to re-engage in business, it is essential that certain recommendations made by his department be complied with. Chief among these is the revamping of the company's securities portfolio by the sale of inferior and highly speculative securities and by the retention of a substantial portion of the proceeds in cash and the investment of the balance in conservative and relatively stable securities " of such a nature that the creditors could reasonably expect the payment of their claims One Hundred Cents on the Dollar today, tomorrow and at all times."

Resolutions passed by the board of directors of the company, as well as the affidavits presented on its behalf, indicate clearly, however, that the company is opposed to any change in its investment portfolio and even to any substantial sales of securities at this time for the purpose of increasing the company's cash resources. The company is opposed to any sales of its securities in addition to those already authorized by orders of this court except to the extent necessary " to cover claims payable at the time the direction of the company is restored to its management, and a reasonable cash reserve in addition." The affidavits submitted by the company establish, however, as previously indicated, that it takes the position that the cash resources required in order to enable it to resume business are only $4,045,162.55, most of which is covered by cash on hand and to be realized from sales already authorized. Although it is estimated that, in addition to the $4,045,162.55 needed immediately, $2,290,000 will be required to satisfy claims to be paid within thirty days after reopening, $3,430,000 to meet claims payable within ninety days after reopening, $2,435,000 to cover claims to be paid within ten months subsequent to resumption of business, and $2,175,000 to pay claims payable thereafter (a total of $14,375,162.55, inclusive of the $4,045,162.55), the company is unwilling to permit the sale of any of its securities at the present time except the small amount necessary to make up the difference between the cash resources required upon reopening, and the cash on hand and to be realized from sales already ordered, taking the stand that no sales should be made except at such times as cash is needed to satisfy claims immediately payable, and only to that extent. In other words, to quote from the affidavit of Deputy Superintendent of Insurance Brennan, sworn to July 19, 1933: " There is no intention on the part of the company's officers to liquidate securities until the obligations of the company mature and become adjusted, which, as they argue, will not be for some time — perhaps months — and in the interval there is no indication of any desire on their part to transform the

securities upon which they rely to meet the obligations into such type of securities as will not again depreciate to the point where the company is *in fact* unable to meet said obligations from the liquidation of the securities retained by it."

This insistence by the company upon the retention of the highly speculative securities which make up a very large part of its portfolio is sought to be justified by the claim that " it is the consensus of the best opinion in the financial world that the value of securities will be higher in the last months of 1933 and in 1934, so that the value of the securities available to the company should be greater." Whatever may be said for a contention of this character in the case of a company with a substantial surplus, it must be manifest that it is entitled to little weight when applied to a company on the very border line between solvency and insolvency — especially where such company is already in the possession of the Superintendent of Insurance for the purposes of rehabilitation as a result of insolvency directly attributable to the volatile and speculative character of the company's investments. In such a situation the right of the company to determine its own investment policy is subordinate to the rights of creditors, policyholders and the general public. The paramount consideration at all times should be the protection and proper safeguarding of the interests of the creditors, policyholders and the public. At the present time the assets of the company appear to be sufficient, if a substantial amount of speculative securities are converted partly into cash and partly into conservative stable investments, to assure the payment in full of all claims against the company. To allow the securities portfolio of the company to remain in its present form would be to permit the stockholders to engage in speculative market activities at the risk and possible expense of creditors and policyholders. This the court cannot sanction.

The necessary revamping of the security holdings of the company, involving as it does the partial liquidation of the present portfolio, would, it is estimated, require several months, and perhaps longer, depending upon market conditions. Liquidation of substantial amounts of securities in quantities too great for the market to absorb would cause prices to break materially and would, therefore, defeat its own purpose. The past history of the company satisfies the court that the interests of creditors and policyholders would be better served if the choice of the securities to be sold and the time and manner of their liquidation were exercised by the Superintendent of Insurance under the court's supervision than they would be if the present management of the company were intrusted with the task, especially in the face of the favor in which the manage-

ment holds speculative securities and its unwillingness to dispose of them.

It may be that after the Superintendent has accomplished the proposed changes in its portfolio and proceeded with its rehabilitation in other respects, the affairs of the company will be in such condition as to permit termination of rehabilitation and the resumption of business by its officers and directors with perfect safety to creditors, policyholders and the general public. It is unnecessary to determine at this time whether all the recommendations made by the Superintendent of Insurance, such as changes in business policy and in personnel, would have to be complied with as a condition of terminating rehabilitation. Suffice it for the purposes of the instant application to state that in the court's opinion the condition of the company at the present time is such that the termination of rehabilitation and the resumption of its business would be hazardous to its policyholders, its creditors and the public. The motion is denied.